## Hess *versus* Brown.

1. A married woman may receive as a gift her husband's property from one purchasing it at a bona fide sheriff's sale, subject to a reservation by the donor and use it, trade with it, purchase other goods with its proceeds and hold all against the husband's creditors.

2. Whether the transfer of this property is a gift, or whether it is a purchase by the married woman on her own credit, without any separate estate to support it, is a question for the jury.

3. Winch *v.* James, 18 P. F. Smith, 297, and Wieman *v.* Anderson, 6 Wright, 311, followed.

November 2d, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas No. 1, of *Allegheny county:* Of October and November Term, 1885, No. 122.

This was a feigned issue to try the right of property to certain goods and chattels which John Brown had caused to be levied on as the property of C. Otto Hess, husband of Catharine Hess, who claimed them. On the trial before BAILEY, A. L. J., the following facts appeared:

C. O. Hess, the husband of Catharine Hess, became financially embarrassed in August, 1875. F. X. Lang and Thomas McCoy levied upon two ice ponds, and ice houses, each having separate outfits, such as horses, harness and wagons. One pond or premise was at Chartiers creek and the other at East Liberty. F. X. Lang purchased the property at Chartiers creek and Thomas McCoy purchased the property at East Liberty. In two weeks after McCoy purchased the premises and outfit at East Liberty, he (being actively engaged in the fish and oyster business in the city of Pittsburgh) gave the ice pond, leasehold, house, ice stored in the house to Mrs. Catharine

[Hess v. Brown.]

Hess, the plaintiff, upon condition that he should have of the ice to the value of $500. She immediately took possession of the property and carried on the business herself, and McCoy obtained of the ice to the amount of $500. She carried on said business for some time, and sold and disposed of the property, retaining out of the property only one horse, being one of those in dispute in this case.

On the 3d of April, 1880, she was decreed to be a feme sole trader. On the 15th of November, 1880, she entered into partnership with George C. Hess for the purpose of carrying on the business of cutting, storing and selling ice in the city of Pittsburgh. Mrs. Hess put into the assets of the partnership the leasehold interest of the ice pond and ice house and one horse as her portion of the stock of the firm, and George C. Hess put into the business cash to the amount of $600. George C. Hess, who managed the partnership business, purchased out of the said partnership funds of $600, before the business fairly started, two grey mares, two carts and the harness. They cut and stored their ice in the ice house during the winter of 1880–81, and on April 1, 1881, dissolved partnership, George C. Hess taking the half of the stored ice and one grey mare, and Mrs. Hess took the remaining portion of the ice, a grey mare, two carts, the harness, and all other property on the premises, as her portion of the assets of the late partnership. She sold her portion of the ice obtained at the dissolution of the partnership for $1,000. Shortly after the dissolution of partnership with George C. Hess, she purchased with the proceeds of her share of the ice another horse, also a two horse wagon, and hiring a driver for the team she carried on the business of teaming. With the proceeds of this business she purchased the harness and two-horse wagon levied on in this case.

The defendant in error having obtained a judgment against her husband, C. Otto Hess, levied upon three horses, one wagon, one cart, one set double harness, one plow, and household furniture.

All of these articles, except one of the three horses, were purchased by the proceeds of the ice business and of the profits of her team after the dissolution of the partnership between George C. Hess and Catherine Hess, and a considerable time after she had been decreed a feme sole trader. Only one of the three horses levied upon had been transferred to her after her husband had been sold out by the sheriff in 1875, and was her own absolute property.

The court charged the jury as follows:

Let me say in the beginning, that you try this case according to the law and not according to your sympathies or inclination, and if this creditor is entitled to this property, it does

[Hess *v.* Brown.]

not make any difference to you whether, in your judgment, it is a great hardship or not. The simple question is, what is the law? And it is your sworn duty, as it is mine, to enforce it.

The Supreme Court, in the case of Pier *v.* Siegle, 15 W. N. C., 480, say: "As a general rule, where husband and wife are in the joint possession or occupancy of personal or real estate, the law presumes the property to belong to the husband, and this presumption continues until the wife shows that she acquired it by means not derived from her husband; and the burden of proof is upon her to prove that she so acquired it. [It is also a rule, too firmly established in this State to be shaken, that a married woman cannot buy personal estate upon credit, unless she is the owner of a separate estate, in which case she contracts upon the credit of such estate.] If she purchases the property with borrowed money or on credit, it belongs to her husband as respects his creditors and is liable for his debts."

Now, that is the general rule, apart from the relation acquired by this plaintiff in 1880, of a feme sole trader. A feme sole means a single woman. She was a trader for herself, and, after 1880, with any property that she possessed of her own, apart from her husband, she had a right to go into business and make profit out of that money. [But, if in 1880, when she was declared a feme sole trader, she had nothing which was not, under the presumption of law I have read you, her husband's, then she had nothing with which she could deal, unless she shows that she obtained the money with which she went into business, and carried it on, and bought certain articles, from some new source.]

[Nor is there any evidence of any new source from which she obtained money, or any source except the original transaction in 1875 when she bought from McCoy and George C. Hess certain ice house affairs, wagons, &c., necessary to carry on the business. Has she offered any evidence of any fresh acquirement of moneys or property of her own, apart from her husband, except what may have been obtained in 1875 by these sales that she speaks about? If she did—if she said even that she had borrowed the money from somebody else after 1880, and had applied it in these various ways, and that these things she has in her possession now were acquired through the borrowed money after 1880, then she would be entitled to them as against her husband's creditors. But has she shown you anything of the kind? Is there any evidence on which you can say, on your oaths, that these things were bought in that way? Or is there anything, excepting the first transaction in 1875, which, in law, was her husband's, and not hers?] That

[Hess *v.* Brown.]

is about all the law there is in the case, and you will have to apply it.

As to the household furniture, that is unquestionably hers, I judge, under the testimony, because she has testified to it, and it is undisputed, and, of course, it is to be believed, that the household furniture is hers.    As to that household furniture she is entitled to a verdict, but whether she is entitled to a verdict as to anything else is to be determined upon the principles of the law I have stated and the facts that are developed here, recollecting that Mrs. Hess must show affirmatively what the law requires.

If you believe, as I have no doubt you will, the testimony of Mrs. Hess as to the household furniture, your verdict will be for her for the household furniture.    If there be any other part of this property that she acquired apart from her husband entirely, and apart from the transaction of 1875, then you will find that in her favor, and if there be any property other than that your verdict will be for the defendant for it.    If you find everything in favor of the wife, even including this horse, which it is admitted was bought in 1875, and not subsequently, your verdict will be, generally, for the plaintiff, but I do not see how you can so find as to that horse.

The verdict was for the plaintiff as to the household goods and for the defendant as to the balance of the property levied on, and judgment thereon.

The plaintiff took this writ of error, assigning as error the portion of the charge enclosed in brackets.

*Robb & Fitzsimmons* for plaintiff in error; *Sam M. Taggart* for defendant in error.

Mr. Justice CLARK delivered the opinion of the court January 4th, 1886.

It is not denied that the sheriff's sale, which was made of the personal goods and estate of C. Otto Hess, in August, 1875, was a bona fide and valid sale.    The levy was upon the lease of two ice ponds, ice houses, etc., each with an outfit for marketing the ice, consisting of horses, harness, wagons, etc.    At the sale, the lease of Chartiers creek, with a horse and wagon and some twelve hundred to fifteen hundred tons of ice, were purchased by Felix X. Lang, who transferred his purchase to George C. Hess, a brother of the execution debtor.    The similar establishment and outfit, at East Liberty, were purchased by Thomas McCoy, who, being in the fish and oyster business in the city of Pittsburgh, turned over his purchase to Catharine Hess; McCoy to have as much ice as he wanted in his business during the year.    George C. and Catharine Hess then

[Hess *v.* Brown.]

carried on the business together until in the fall of the same year, when George C. also transferred his purchase to Catharine for the sum of $50. McCoy took as much ice from the ice houses as he wanted, sometimes taking as much as eight hundred pounds in a single day; in the aggregate, about $500 worth of the ice during the year.

The plaintiffs below contend, that as Catharine Hess has not shown that she had any separate estate, or means of her own, the transfer to her by McCoy was in legal effect a transfer to the husband, as respects his creditors. It is certainly true, that in Pennsylvania, a married woman cannot buy personal estate upon credit, unless she is the owner of a separate estate, in which case she contracts upon the credit of such estate. If she purchases property with borrowed money or on credit, her husband's creditors may seize and sell it as his: Pier *v.* Siegle, 15 W. N. C., 480. That she had means is not enough; she must prove affirmatively that her means paid for it, or that she came by it otherwise independently of her husband: Winter *v.* Walter, 37 Pa. St., 155. So, also, property bought by a married woman upon her individual credit, and subsequently paid for solely with the profits of business in which she engages therewith, is to be regarded as the property of her husband, and subject to execution by his judgment creditors: Leinbach *v.* Templin, 105 Pa. St., 522; Keeney *v.* Good, 21 Pa. St., 349.

But did McCoy actually sell the establishment at East Liberty to Mrs. Hess, or did he bestow it upon her, subject to a reservation in his own favor? The transaction is not very fully developed in the testimony; a more detailed and particular statement of the facts may, perhaps, put that matter beyond doubt, but as the case is now presented the true nature of the transaction is certainly somewhat indistinct. If Thomas McCoy, after his purchase, chose to make a gift of the goods to Mrs. Hess, with a reservation of such part of the ice as he might require for use in his business during the year, he had a right to do so, and Mrs. Hess had an undoubted right to receive them as a gift, and to hold them as her own, not only as against her husband, but as against his creditors, subject only to the reservation.

For certainly a judgment creditor, purchasing his debtor's property at a bona fide sheriff's sale, may convey it to the debtor's wife as a gratuity, with like effect as to any other person Winch *v.* James, 68 Pa. St., 297, and she would be entitled by the statute to use, own and enjoy it to such extent as is consistent with its nature. She may trade with it, purchase other goods with its proceeds, and hold all against the husband's creditors: Wieman *v.* Anderson, 42 Pa. St., 311.

[Hess *v.* Brown.]

What was the real character of the transaction, as we have said, is left, perhaps, in some degree of uncertainty under the evidence; the language of the witnesses is to some extent equivocal. If there was no agreement upon the part of Mrs. Hess to pay McCoy any specific sum, or to deliver to him ice in any quantity or amount, definite or indefinite; if the ice and outfit were a gift, and no personal obligation was assumed for the price, but McCoy simply reserved the right to take as much of the ice as he wanted from time to time during the year, in his business, and did take of it as he needed, the technical relation of debtor and creditor would not subsist between them. The reservation, if there was one, could not form the consideration of a contract, or convert that which was intended as a gift or gratuity into a sale: Riegel *v.* Wooley, 1 Weekly Notes, 310 is somewhat analogous in principle. In that case, Bedford made a gift of the stock in a store to his married sister, Mrs. Wooley, requesting her, out of the proceeds, to pay off some of Bedford's outstanding notes, which subsequently she did. This court said in that case that the question was properly submitted to the jury, and that the verdict settled the fact that Bedford made a gift and not a sale to his sister; that the provision that certain debts should be paid out of the proceeds of the goods, being found to be a mere condition attached to the gift, by which so much was devoted to the payment of these debts of the donor, did not make the gift of the remainder a sale, but that the transaction was simply a gift, subject to an appropriation of a certain portion to others.

The learned court, however, seems to have assumed that the transaction, in fact, was otherwise than we have intimated it may have been; that is to say, that it was a purchase by a feme covert, upon her own credit, without any separate estate to support it. We think the cause should have been submitted to the jury, under proper instructions, to determine from the oral proofs the true nature of the transaction, according to the meaning and intention of the parties. We express no opinion upon the evidence; as the cause goes back for another trial, it is better that we should not.

Upon this question, however, the determination of the cause would seem to us in great measure to depend. If the transfer by McCoy was a gift and not a sale upon credit, Mrs. Hess became thereby the owner of a separate estate, which, if found to be reasonably proportionate, would support her purchase of the interest of George C. Hess in the establishment at Chartiers Creek; and these interests conjoined might invest her with an estate in personalty, to which her subsequent purchase of the property taken in execution might be satisfactorily

1 AMERMAN—9

traced, and by which her alleged business transactions and dealings, on her own account, might be fully explained.

If the property which she claimed prior to the decree, under which she was declared a feme sole trader, was the property of her husband, it is difficult to see how she acquired the means to purchase the property, by which she conducted business afterwards. She does not pretend to have procured it upon her credit as a feme sole trader, nor even upon money borrowed upon that credit, and it is not suggested that she had any other source of income independently of her husband. She says, in a general way, that the money was made by teaming, but with whose team ? If the horses and wagon were, in fact, the property of her husband, in respect of his creditors, the mere employment of a driver, and the management of the business, by her, would not give her title to the earnings : Fry *v.* Ray, 34 Leg. Int., 214. As we said in Lienbach *v.* Templin, *supra,* it was not the intention of the Legislature to dispense with the presumptions, which ordinarily and of necessity arise, in favor of creditors, in transactions between husband and wife, affecting the ownership of property in the wife's name.

The judgment is reversed, and a venire facias de novo awarded.