102 N.J. Super. 395 (1968)
246 A.2d 72
IN THE MATTER OF THE ESTATE OF ANGELO CARPENTIERO, DECEASED.
Superior Court of New Jersey, Middlesex County Court, Probate Division.
Decided June 24, 1968.
*397 Mr. David Sapiro for executrix of the estate (Messrs. Russ & Sapiro, attorneys).
Mr. Edwin G. Scovel for Hahnemann Medical College and Hospital, a corporation, creditor.
Mr. William C. Moran, Jr. for Grant Plumbing Co., creditor (Mr. J. Schuyler Huff, attorney).
Mr. Isadore M. Zamost for Aaron & Co., Inc., creditor.
SCHWARTZ, J.C.C.
General creditors of this insolvent estate protest a preference to a hospital for services rendered "during the last illness." The hospital claims its preference under N.J.S. 3A:24-2:
*398 "The following expenses and debts shall have preference and be paid out of the personal and real estate of the decedent, according to the following order:
1. Funeral expenses.
2. Administration expenses.
3. Debts entitled to a preference under the laws of the United States.
4. Hospital, physicians' and nurses' bills during the last illness.
5. Judgments entered against the deceased according to the priority of their entries respectively. * * *." (Emphasis supplied)
The claim rests on the following facts: Dr. Paul Jennings, a cardiologist, treated decedent for rheumatic heart disease and coronary heart disease and referred him to the hospital for a "serious" heart operation. The patient was admitted on September 20, 1966 and discharged on November 2, 1966. Thereafter, decedent saw Dr. Jennings on November 8 and December 23, 1966, did not keep an appointment for January 30, 1967, and died on January 31, 1967. Decedent was 48 years old on the date of death. The cause of death noted on the death certificate was "coronary occlusion, coronary insufficiency, rheumatic heart disease." Dr. Jennings stated his patient continued to have chest pain and symptoms of heart failure, episodes of elevated temperature and coughs, and that his condition "deteriorated after discharge"; that on December 23, 1966 he still suffered from rheumatic heart disease and coronary heart disease and was continued on digitalis, penicillin and diuretic and coronary dilation; that "he never recovered from the condition" for which he was sent to the hospital; that between November 8 and December 23, 1966 "he got worse"; that no other conditions intervened between discharge from the hospital and death  "it was the same thing"; that he died of acute coronary occlusion and the rheumatic heart disease, which complicated each other, lessening chances of a successful operation; that following discharge the doctor advised him to rest at home and did not know he was working at his plumbing business.
The widow said her husband, a plumber, employed one full-time man and one part-time man; that at the time of his discharge from the hospital he "didn't look like himself" *399 and experienced great difficulty in walking; that he remained at home and used the phone for his business, and only went to supply houses and to make job estimates; that following his discharge he always complained, didn't sleep and had chest and arm pains; that he was limited in his activities for about six months prior to the operation but he did even less after the operation; that her daughter accompanied decedent on his visits to the doctor; and that he had suffered from rheumatic fever since childhood.
Witnesses for the general creditors testified that decedent purchased plumbing supplies after his discharge; that his volume was not as much following his discharge as before  "maybe half"; that his physical involvement was less following his discharge and that the plumbing houses helped him load supplies because "all knew his condition."
The question presented is whether the services rendered by the hospital were services "during the last illness," within the contemplation of N.J.S. 3A:24-2, taking into consideration the fact that the decedent lived for three months after his discharge from the hospital, resumed the operation of his plumbing business, visited his doctor only twice before his death, and died suddenly.
The fundamental canon of statutory construction is to divine the intent of the Legislature. I find no reported case in New Jersey dealing with the meaning of "during the last illness," the phrase in N.J.S. 3A:24-2.
"The order of payment prescribed by the common law was, first, funeral charges and the expenses of administration; second, debts of record; third, debts by specialty; and, fourth, simple contract debts. Haines v. Price, Spen. 480; Grif. Reg. 1281, note." Bowes v. United States, 127 N.J. Eq. 132, 136 (Ch. 1940).
Claims of a medical nature were not preferred at the common law.
The early statutes granted a preference to physicians' bills "during the last sickness." L. 1898, c. 234, § 66, p. 738; Rev. of 1877, p. 764, § 58; Rev. Stat. p. 346 § 2 of 1847. *400 In 1916 the statute was broadened to include nurses' bills "during the last sickness." L. 1916, c. 35, § 1, p. 62. In 1941 the statute was broadened again to include hospitals' bills "during the last sickness." L. 1941, c. 228, § 1, p. 646. In the 1951 revision of Title 3, "last sickness" was changed to read "last illness." N.J.S. 3A:24-2.
I am unable to find any record of legislative motivation for the statute, save for the "Statement" annexed to the 1941 amendment:
"The purpose of this proposed amendment is to include hospitals as preferred claimants for hospitalization rendered during the last sickness of the decedent. As hospitals are charitable in nature, they are entitled to this protection." (Emphasis supplied)
Similar statutes have been construed in other jurisdictions. In Maine, the court said:
"The object which the Legislature had in view doubtless was that a sick man, though possessed of but very little property, should be in no danger of suffering by reason of the want of medical advice and assistance, even where unfeeling physicians, if there are any such, would be tempted to refuse or withdraw their professional attentions, apprehending they might lose their reward." Huse v. Brown, 8 Me. (Greenl.) 167 (1831), quoted in McLean v. Breen, 183 S.W., 394, 397 (Tex. Civ. App. 1916).
With equal probability it could be surmised that the Legislature also sought to assure medical attention to those hesitating to seek it because unwilling to be the object of charity and to assure the status attached to a paying patient.
The phrase "last illness" has been construed in other situations such as nuncupative wills. Annotation, 9 A.L.R. 462, 464 (1920). The majority view, to which New Jersey adhered, requires that the nuncupation take place during "extremis."
"That is, the law contemplates sudden and severe illness immediately preceding physical dissolution, when there is neither time nor *401 opportunity to make a written will, and therefore, in such case, if there is to be a will, it must of necessity be a merely verbal one." Carroll v. Bonham, 42 N.J. Eq. 625, 627 (Prerog. 1887).
The suddenness and severity of the illness is a sine que non regarding a nuncupative will. Courts which have considered this issue do not restrict the preference to medical services rendered in extremis or in sudden illness situations. Recovery of health sufficient to exclude a nuncupative will would not rule out a hospital preference. The reasons for the rule in each respective area appear to be anchored in distinctly different theories. In the will situation, time will not permit reduction to writing. The overriding legislative intent in the preference statute appears to be a decent regard that medical services be rendered to those in need.
The period to be included within the phrase "last sickness" has been restricted in cases involving a trust (McLean v. Breen, 219 S.W. 1089) (Tex. Com. App. 1920); a federal pension (U.S. v. Fresbie, 28 F. 808 5th Cir. 1886); a gift to avoid dower (Rice v. Waddill, 605, 168 Mo. 99 (67 S.W. 605 (Sup. Ct. 1902); and gifts causa mortis (Robson v. Robson's Adm'r, 3 Del. Ch. 51 (Ch. 1886); Weston v. Hight, 17 Me. 287 (Sup. Jud. Ct.) (1840).
The considerations involved in the meaning of trust provisions and pension laws have no relation to the object of a statutory preference. The consideration of contemplation of death inheres in situations concerning gifts causa mortis and to avoid dower; but contemplation of death is not an express requirement of our act, and I see no basis for its implication.
In McLean v. Crow, 88 Cal. 644, 26 P. 596 (Sup. Ct. 1891), the court, considering a preference, said in dictum that "last sickness" means something more than services rendered in extremis, and something more than the same phrase in statutes authorizing nuncupative wills. Other states have construed similar statutes liberally. See Annotation, 9 A.L.R. 462, 464 (1920).
*402 The statutory language is "during the last illness." "During" is defined as "in the time of" and "after the commencement and before the expiration of." "Last illness" is defined as the "illness terminating in person's death." Black's Law Dictionary (4th ed.). Any other cause of death appears beyond the legislative intent. For example, if a patient discharged from a hospital met with an accident on the way home, and died of injuries entirely unrelated to the condition treated, it seems quite plain that a preference to such hospital claim was not contemplated.
Other courts have considered several subordinate questions as relevant: the period between the date of last treatment and date of death; the patient's condition on discharge, his prognosis, and his recovery or lack of it; the regularity of medical attention and the recovery of the patient to an extent sufficient to permit his attending to his ordinary and business affairs over some period following the rendition of services. See Annotation, 9 A.L.R., supra. While no case in any jurisdiction has been found involving a hospital bill, I cannot distinguish it from a physician's or a nurse's bill. When a long period of time intervenes between hospital discharge and death, it would be unreasonable to construe the intent of the Legislature to be to unfairly subordinate debts incurred during such period. The court is of the opinion that the Legislature did not intend that a hospital be permitted to rest on its claim for an undue period while others extend credit to permit the former patient to continue a normal life and to earn a living. Under such circumstances a creditor's humane and decent regard for a man's promise to pay ought not to result in prejudice.
The time lapse from hospital discharge to death was about three months in the instant case. The expert testimony indicated the operation was serious; that the patient was still under the doctor's care; that he was still on medication; that he never recovered from the condition; that he did not improve following discharge; that "he got worse", that "no other conditions intervened between operation and *403 death", that decedent's condition was complicated by two diseases of the heart; that patient was advised not to participate in his plumbing business; and that death resulted from coronary occlusion. Other testimony indicated decedent did not fully participate in his plumbing business following discharge; that he was not the same man although he had confined somewhat his work prior to his hospitalization as well; and that the plumbing houses helped him load supplies because of their konwledge of his condition.
"The last illness within the meaning of a statute, giving preference to the expenses thereof, is the illness which terminated in the patient's death and the right to a preference is limited to services performed and expenses incurred during that illness, but unless the period is designated by statute, no particular period preceding death can be fixed as constituting the last illness, as the duration of such illness must vary considerably according to the nature of the disease and the condition of the patient. While it has been held that such a statute must be strictly construed, it has also been held that it should be liberally construed, and the expression cannot be limited in meaning to the period during which decedent was in extremis; but on the other hand it relates to the proximate, and not the remote cause of death, and a claim for medical attendance cannot be made to cover a long period during which the patient lingered, partially convalescent, the attendance being broken off during the convalescent period and then renewed on decedent's relapse, especially where there had been a change of physicians." 34 C.J.S. Executors and Administrators § 461, at pp. 317-318 (1942).
This preceding statement has been said to be a summary of all the decisions and to express the meaning and application given to the preference statutes by the courts generally. Proto v. Chenoweth, 40 Ariz. 312, 11 P.2d 950-951. (Sup. Ct. 1932).
In Proto, the court said (at p. 952) that "last illness" is not elastic enough to cover all those ills to which old age is heir, but picks out the particular illness which terminates in death. And further:
"* * * to allow a physician purposely or negligently to postpone collecting for his services until after his patient is dead, even though *404 the patient during much or all of the time was able to be up and around and transact business, is giving the phrase a rather more liberal meaning than was ever intended, we apprehend." (at p. 952)
"Last illness" is to be judged in the light of the above and accorded a reasonable interpretation. In the case of a patient suffering for some long period from a chronic or incurable condition or a disease of a progressive nature during which, while receiving medical attention, he also is able to attend to his affairs, other creditors should be fairly considered. Here, the patient was advised not to work. That he did do some work is not controlling. That he should not have worked, rather than the fact that he did, seems the proper inquiry.
In Huse v. Brown, supra, decedent died six months after the last treatment, which covered the period from January 19 to June 28, 1928 and he died on December 16, 1928. He had cancer of the nose for about two years and engaged in some personal attention to his farm during the summer of 1928 and was abroad the following autumn. The preference was sustained.
The period to be preferred is the interval commencing when a patient is permanently stricken and does not recover from the ravages of a long-standing condition, and not the treatment over a long period covering months or years. Proto v. Chenoweth, supra. Any other construction would lead to extremely large medical claims prejudicial to other worthy claims, and would favor dilatory practices on the part of medical claimants.
The intent of our Legislature ought not be given a more confining construction than that given by other courts to physicians' and nurses' bills. As with physicians and nurses, the services rendered by a hospital are medical in nature. The reasoning as to legislative intent regarding physicians' bills would apply with equal force to a hospital bill. In no perceivable way does the public nature of the institution weaken the claim.
*405 Physicians and nurses were preferred prior to the 1941 amendment. They are not charitable. The legislative objectives as above stated appeal to reason, and hospitals ought to be regarded in the same way. Their charitable nature evidently persuaded our Legislature to "include" them on a par with physicians and nurses, but there is no apparent reason to apply a more limited scope to hospital claims.
I find that the proximate cause of death was the condition for which decedent was treated at the hospital. I find that the services rendered by the hospital for the treatment of this condition, from which he never recovered, were services during his last illness within the intent and meaning of the statute. The period of three months from the hospital discharge to the patient's death is not so inordinate as to require the denial of a preference.
The general creditors contend that the hospital has substituted decedent's wife as the debtor and that this substitution constituted a novation.
On September 20, 1966 both decedent and his wife signed a form agreeing to pay for the services rendered at the hospital.
To constitute novation, there must be an agreement between the creditor, the old debtor and the new debtor to substitute the new debtor for the old debtor and to release the latter. J. Shlainsey, Inc. v. Aitken, 127 N.J.L. 246, 248 (E. & A. 1941). Novation is never presumed. Id.
In Sixteenth Ward, &c., Ass'n v. Reliable Loan &c., Co. 125 N.J. Eq. 340 (E. & A. 1938) the court stated:
"* * * Novation is generally accepted to mean that there being a contract in existence, some new contract is substituted for it, either between the same or different parties, the consideration mutually being the discharge of the old contract. Morecraft v. Allen, 78 N.J.L. 729; Cooke v. McAdoo, 85 N.J.L. 692. In order to effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well settled principle that novation is never to be presumed. The intention by the obligor that the existing debt should be discharged by the new obligation must be concurred in by both debtor *406 and creditor. The existence of such an intention need not be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction and the conduct of the parties thereafter. Griffin v. Cunningham, 183 Mass. 505; 67 N.E. 660; 20 R.C.L. 366; 46 C.J. 580." (at pp. 342-343)
In Tolland v. Lista, 46 N.J. Super. 272 (App. Div. 1957), the court said:
"In order to effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed." (at p. 277)
The date on the form is the date of the admission to the hospital. The facts indicate that the signing of the form was an original undertaking having no reference to any prior obligation of any party. Nothing in the facts presented to the court indicate a novation, either directly or by implication.
A general creditor also urges that the pendency of a suit by the hospital against decedent's wife for the bill and the hospital's claim for a preference against the estate are inconsistent and support the denial of a preference. No authority was presented for this contention. In my opinion, this argument has no merit.
The court has not been advised whether the hospital will be paid in full if it is granted a preference. There may be a claim against the wife for a deficiency. In any event, there cannot be more than one full recovery.